**Madge D. McNEIL and Paul A. Griffith, Executor of the Estate of James W. Norris, Deceased, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 73–528.**

United States District Court, S. D. Ohio, E. D.

Feb. 21, 1975.

Douglas E. Hoover, Bailey & Houfek, Worthington, Ohio, for plaintiffs.

Albert R. Ritcher, Asst. U. S. Atty., William W. Milligan, U. S. Atty., Columbus, Ohio, for defendant.

## OPINION AND ORDER

KINNEARY, Chief Judge.

This matter is before the Court following a trial on the merits. Plaintiffs instituted suit against the United States for the sum of Ten Thousand Dollars ($10,000.00), seeking the proceeds of a National Service Life Insurance Policy insuring the life of James W. Norris, deceased. Jurisdiction of this Court is

founded upon Title 38, United States Code, Section 784.

Pursuant to Rule 52, Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

James W. Norris, deceased, was a medical doctor and a long time resident of Columbus, Ohio. On November 5, 1951 National Service Life Insurance Policy No. V634–25–13 insuring the life of Dr. Norris in the face amount of $10,000.00 became effective. This was a renewable five year level premium term policy. On December 6, 1966 the last premium was paid on this policy. On May 14, 1972 James W. Norris died at the age of 64. An application for waiver of premiums was timely filed by the plaintiffs herein on or about February 20, 1973, and the Veterans Administration administratively denied this claim on September 28, 1973. Thereafter this suit was commenced.

Madge D. McNeil is a first cousin of Dr. Norris and is a named contingent beneficiary of the policy. The estate of James W. Norris is also a contingent beneficiary of said policy, and plaintiff Paul A. Griffith is the duly qualified, appointed and acting executor of that estate.

During 1957 Dr. Norris was divorced from his wife and he then lived with his mother until her death in February of 1964. Following his mother's death, he lived alone until his own death in May of 1972. Prior to 1964 Dr. Norris had ceased the practice of medicine and the parties agree that he was not gainfully employed during the period which is subject to the claim for waiver of premiums. It was not clearly established why Dr. Norris ceased practice, but ill health seems to have played a part in that decision.

Beginning in 1966 Dr. Norris became a recluse and would often fail to answer his door. He also had his telephone removed and instructed the post office to discontinue home deliveries. Mail was held at the post office but was seldom picked up and much of his mail was returned to the sender. Following Dr. Norris' death, much unopened mail was found in his apartment, some of it containing checks representing income from investments. From the time of his mother's death, Dr. Norris held substantial investments and his total gross estate amounted to more than $300,000.00.

Dr. Norris' cousins made an effort to look after him and invited him to family gatherings on holidays. To reach him they would usually have to place a note under his door. The doctor would then call and they would make arrangements. Although he was chronically late to these meals, this had been his habit for twenty years and the doctor always came and would get there by himself. He was withdrawn, but would join in conversations and was particularly interested in sports.

The family often talked about the past, and Dr. Norris had a good memory concerning his early years. It was testified that on one occasion he claimed to be bothered by nonexistent "bugs." The members of the doctor's family testified that they saw him perhaps as many as six times a year. The possibility of establishing a guardianship for Dr. Norris was discussed but the family rejected this idea primarily because they did not want to hurt his feelings.

The doctor was negligent about paying his rent, but always paid in full when personally contacted. He also failed to tend to business affairs and often neglected to open or cash income checks. Despite reminders, Dr. Norris was delinquent in paying an estate tax deficiency on his mother's estate. Dr. Norris also failed to appear for appointments with his lawyer. It is not disputed that he was thin at this time and appeared very pale.

Despite these eccentricities, Dr. Norris lived alone and cared for himself until his death due to a myocardial infarction. It is believed that he did not pre-

pare his own meals but ate at restaurants. He drove a car and his family was never particularly concerned about any danger to him from driving. The doctor was an avid football fan and often attended the Ohio State games. In fact, he took a trip to the 1971 Rose Bowl game and then journeyed through the southwest. He traveled alone, primarily by plane, and was gone for approximately six weeks.

Jerry Cohen, a neighborhood pharmacist, testified that Dr. Norris would stop at his store three or four times a week during the later years of his life and they would often chat. The doctor would usually buy toiletries, candy, cold capsules, and items of that nature. Mr. Cohen testified that he never sold Dr. Norris narcotic drugs and the only prescription drug he remembers selling him was an antibiotic. The doctor customarily paid in cash and the store would often cash checks for him. The conversations between Dr. Norris and the pharmacist usually centered on sports, current events and aspects of medicine. These conversations were rational and the pharmacist testified that the doctor had remarkable knowledge of medicine and that his recall was unbelievable. As a joke, Mr. Cohen would often open a text and put a question to the doctor, who usually astonished him by his knowledge of detail. During these visits the doctor was sometimes bedraggled but was always clean and sometimes was dressed very well.

Dr. Silbernagel, a physician, had known Dr. Norris since approximately 1936. After 1965 he would encounter Dr. Norris once every two or three months, and they would often speak about medical subjects. Dr. Silbernagel testified that Dr. Norris had an excellent memory about medical subjects and had a very good sense of humor. He characterized Dr. Norris as an absolute perfectionist as a surgeon. He believes that Dr. Norris was prompted to resign from the Ohio State University Medical Staff, but did not know the circumstances.

James Maxwell was an attendant at a gasoline station that Dr. Norris patronized. He knew the doctor for about three years prior to his death. He testified that the doctor kept his car in good condition and paid promptly by check. The doctor would often request servicing of the automobile on his own initiative.

During 1965 Dr. Norris was hospitalized and was late in paying two monthly premiums on his National Service Life Insurance policy. He wrote to the Veterans Administration enclosing payment and explaining the circumstances. He was then furnished with an application form for his possible use in requesting waiver of premiums due to total disability. By letter dated August 10, 1965 Dr. Norris returned the blank form indicating that he was completely recovered from his recent illness. He wrote that "I certainly do *not* feel that I qualify, at all, for a waiver of premiums, in as much as I am in perfectly good health . . . ." At a later point in the letter Dr. Norris stated that "I am definitely not a candidate for a waiver of premiums . . . ." Subsequently, regular premium payments were received through December, 1966. The Veterans Administration sent a lapse notice when the January 1967 premium was not received, but there is no record of any reply from Dr. Norris. Several unopened letters from the Veterans Administration were found among the doctor's belongings after he died.

There is no doubt that Dr. Norris became a bit eccentric during the years between 1964 and his death. There is no substantial evidence, however, that he was mentally ill or otherwise totally disabled. The government's witnesses probably saw Dr. Norris more frequently than his family did. On these occasions the doctor was seen outside his home and he seemed rational and carried on many activities normally, such as driving a car, writing checks and purchasing needed items for personal use. The evidence clearly indicates that Dr. Norris was not totally disabled.

## Discussion

The last premium was paid on this policy on December 6, 1966. Under normal circumstances the policy would have lapsed for nonpayment of premiums on January 5, 1967. Plaintiffs contend, however, that Dr. Norris was totally disabled at this time and that he was entitled to waiver of premiums.

38 U.S.C. § 712(a) provides that upon application of the insured, payments of premiums on insurance may be waived during the continuous total disability of the insured. 38 U.S.C. § 712(c) further provides that:

> If the insured dies without filing application for waiver, the beneficiary, within one year after the death of the insured . . . may file application for waiver with evidence of the insured's right to waiver under this section.

*See also* 38 C.F.R. §§ 8.40, 8.41(b).

■ Ordinarily, however, waiver of premiums is not effective as to any premium which became due more than one year prior to the date of insured's death. 38 C.F.R. § 8.41(b). However, "the Administrator may grant waiver of premiums in excess of such 1-year period in any case in which he finds that the insured's failure to submit timely application or satisfactory evidence to show the existence or continuance of total disability was due to circumstances beyond the insured's control." 38 C.F.R. § 8.41(b). In this case the first premium missed was due January 5, 1967, more than five years prior to the insured's death on May 14, 1972. Thus, in order to recover the proceeds of this policy, plaintiffs must prove not only that the insured was totally disabled but also that his failure to submit timely application for waiver of premiums was due to circumstances beyond his control. Furthermore, the normal five year term of the policy ended on November 4, 1971. Thus, plaintiffs must also establish that the policy was renewed under the provisions of 38 U.S.C. § 705 and thus was in effect on the date of the insured's death.

■■ The burden is on parties seeking benefits under a National Service Life policy to establish that the insured was totally disabled and was prevented from making timely application for waiver of premiums due to circumstances beyond his control. Gossage v. United States, 229 F.2d 166 (6th Cir. 1956); Ferguson v. United States, 309 F.Supp. 632 (E.D.Va.1970); United States v. Sinor, 238 F.2d 271 (5th Cir. 1956), cert. denied 353 U.S. 985, 77 S.Ct. 1287, 1 L.Ed.2d 1144 (1957).

38 C.F.R. § 8.43 defines total disability as "any impairment of mind or body which continuously renders it impossible for the insured to follow any substantially gainful occupation." Based on the evidence in the case and the applicable precedent, the Court holds that Dr. Norris was not totally disabled within the meaning of the statute and regulations.

## Conclusions of Law

This Court has jurisdiction over the subject matter of this action under the provisions of Title 38, United States Code, Section 784.

Plaintiffs have failed to prove by a preponderance of the evidence that the insured was totally disabled and was prevented from making timely application for waiver of premiums due to circumstances beyond his control. The National Service Life Insurance Policy insuring Dr. Norris was not in full force and effect on the date of his death, and plaintiffs are therefore not entitled to the death benefit proceeds.

Whereupon, it is ordered that the Clerk of this Court shall enter judgment for the defendant.